UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

|  |  |  |
|---|---|---|
| KELLEY S. O'BRIEN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Docket No. 1:10-cv-173-jgm |
| | : | |
| ROBERT BARROWS, Police Officer, Shelburne Police | : | |
| Department, JAMES WARDEN, Chief, Shelburne Police | : | |
| Department, TOWN MANAGER OF SHELBURNE, | : | |
| and TOWN OF SHELBURNE, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM AND ORDER**
(Docs. 89, 91)

I.      Introduction

        All of the Defendants in this section 1983 action have moved for summary judgment, with

the Town of Shelburne ("the Town"), Chief James Warden, Town Manager Paul Bohne filing a joint

motion.  (Doc. 89.)  Officer Robert Barrows has filed a separate motion.  (Doc. 91.)  The Plaintiff,

Kelley S. O'Brien, has filed an opposition, and the Defendants have filed reply memoranda.  (Docs.

94, 96, 98.)  For the following reasons, the motions for summary judgment are GRANTED, and

this action is DISMISSED.

II.     Factual Background[1]

        On February 13, 2009, the Plaintiff drove from Burlington to Charlotte, Vermont to inquire

about a possible construction job.  ( Doc. 94-2 at ¶¶ 2-3.)  After he failed to find the job site, he

---

[1] Except where otherwise indicated, the following facts are undisputed.  The Plaintiff
complicated this Court's analysis by failing to comply with Local Rule 56(b), which requires parties
opposing a summary judgment motion to submit "a separate, concise statement of <u>disputed</u> material
facts."  L.R. 56(b).  The Plaintiff instead submitted a "statement of material facts" that includes both
disputed and undisputed facts.  (Doc. 94-2.)  The Court has nevertheless parsed through both the
Plaintiff's statement and the Defendants' joint statement, as well as the documents submitted in
support, to identify factual disputes.

began driving back to Burlington on Route 7.  Id. at ¶ 5.  Another driver on the road called Vermont 911 to complain that he had observed a car, later identified as the Plaintiff's, driving very erratically.  Id. at ¶¶ 10-11.  The driver relayed its license plate number to the 911 operator.  Id. at ¶ 10.  As he spoke to the operator, the driver observed the car pull into the Jiffy Mart in Shelburne.  Id.  He also reported this information to the operator.  Id.

At around 6:30 p.m., the operator contacted the Shelburne Police Department ("SPD")[2] regarding the report.  The SPD then dispatched Officer Barrows to the Jiffy Mart.  Id. at ¶¶ 10, 12.  He was informed that Vermont 911 had received an erratic operation report, provided the license plate number of the car, and informed that it had parked in the back of the Jiffy Mart near the gas tanks.  Id. at ¶ 12; Doc. 89-7 at ¶ 4.  Dressed in his uniform, he drove to the Jiffy Mart in a fully-marked police cruiser.  (Doc. 89-2 at ¶ 14.)

Upon arriving at the Jiffy Mart, Officer Barrows observed a car on the northern side of its parking lot between the store and a gas tank.  Id. at ¶ 15.  The car had the same license plate number as the one in the erratic operation report.  (Doc. 94-2 at ¶¶ 10, 13.)  The car faced east, with its rear towards Route 7.  Id. at ¶¶ 8, 14.  Officer Barrows entered the Jiffy Mart's southern entrance, looped around the back of the store, and positioned his cruiser almost nose-to-nose with the Plaintiff's car.  Id. at ¶¶ 13-14.  He did not activate his cruiser's lights.  Id. at ¶ 15.  Officer Barrows testified that he normally stops vehicles by positioning his cruiser behind them.  (Doc. 89-4 at 49.)  To avoid placing his cruiser in the middle of the parking lot, however, he elected to approach the Plaintiff's car from its front.  (Doc. 89-2 at ¶ 17.)  A couple of vehicles were parked by the gas pumps located closest to the store.  (Doc. 94-2 at ¶ 28.)  At least one passenger was pumping gas.  Id.  The Jiffy Mart was

---

[2]  The Plaintiff originally named the SPD as a defendant.  (Doc. 6 at 2.)  Because the SPD is a municipal sub-unit that lacks the capacity to be sued, the Court previously dismissed the SPD from this case.  (Doc. 28 at 3-4.)

"busy and congested" at the time, as it was rush hour. (Doc. 94-4 at 90, 111; Doc. 94-16 at 4; Doc. 94-17 at 4.)

At this point, accounts of what happened diverge. The Plaintiff testified at his deposition that he had stopped at the Jiffy Mart to purchase lottery tickets. (Doc. 94-4 at 68.) As he searched for money in his car, he looked up and saw Officer Barrows exiting his cruiser. Id. at 89, 92. The Plaintiff believed Officer Barrows intended to ask him to move his car, which was blocking the path of the cruiser. Id. at 95-96. To allow the cruiser to pass through, the Plaintiff testified that he backed his car into the parking lot. Id. He denied verbally communicating with the officer before reversing his car. Id. at 96-97. He explained that he "wasn't going very fast at all" as he reversed. Id. at 102. His tires did not squeal. Id. Nor did his car strike anything. Id. at 104, 107. He did not observe Officer Barrows as he reversed, instead looking backwards towards the gas pumps. Id. at 104-05. He denied hearing Officer Barrows yelling at him to stop. Id. at 105, 107.

The Plaintiff described stopping his car between the store and the gas pumps in front of it. Id. at 102-04. He paused there for maybe fifteen to twenty seconds before deciding to forego the lottery tickets and leave the Jiffy Mart. Id. at 105-06. The Plaintiff stated that he began driving forward towards its northern exit, angling his car northwest in order to reach it. Id. at 108, 112-13. As he straightened out near the exit, the Plaintiff testified that he observed Officer Barrows standing to the driver's side of his car. Id. at 113-15. He slowed down in response. Id. at 118. Officer Barrows began raising his gun as the Plaintiff came to a stop. Id. The Plaintiff made eye contact with the officer while momentarily stopped. Id. at 116. He explained that the lack of emotion in the officer's eyes terrified him. See id. (Officer Barrows "scared the hell out of me. This guy's eyes were just black."); id. ("His eyes looked like they were just pupils. There was no color."). The

Plaintiff and Officer Barrows were about five feet away from each other at this point. <u>Id.</u> at 116-17, 127-28.

When Officer Barrows began to point his gun at the Plaintiff, the Plaintiff testified that he "slammed on the gas and took off." <u>Id.</u> at 121-22. As soon as the Plaintiff accelerated, Officer Barrows fired. <u>Id.</u> The Plaintiff testified that he saw a flash and then his windshield shattered. <u>Id.</u>

Officer Barrows recounted these events differently at his deposition. Upon parking his cruiser in front of the Plaintiff's car, Officer Barrows testified that he approached the Plaintiff and told him to "hold up" so that he could speak with him. (Doc. 89-5 at 52.) Officer Barrows informed the Plaintiff that he had received a complaint about his driving and requested, three times, to see his license and registration. <u>Id.</u> at 52-53. Instead of complying with this request, the Plaintiff backed-up towards the gas pump "very fast," striking Officer Barrows in the process. <u>Id.</u> at 54-56. The Plaintiff reversed so quickly that Officer Barrows feared for the safety of customers at the Jiffy Mart and worried the car might hit the gas pumps, causing an explosion. <u>Id.</u> at 55. Officer Barrows testified that the Plaintiff's car hit his left leg as it reversed. <u>Id.</u> He put his hands in the air and yelled "stop the car" multiple times <u>Id.</u> at 57-58. Officer Barrows testified that the Plaintiff stared at him while reversing. <u>Id.</u> at 58. To remain in the Plaintiff's field of vision, Officer Barrows moved towards the northern exit of the Jiffy Mart as the Plaintiff backed-up towards the gas pumps. <u>Id.</u> at 57.

Officer Barrows explained that the Plaintiff's car began rolling towards him after pausing near the gas pumps. <u>Id.</u> at 58, 60. Officer Barrows continued to yell "stop the car" and waive his hands in the air. <u>Id.</u> at 60. He testified that the Plaintiff maintained eye contact with him. <u>Id.</u> When the car began to accelerate directly at him, Officer Barrows drew his gun and fired at its windshield. <u>Id.</u> at 61. He testified that he intended to shoot at the Plaintiff in order to prevent the

car from hitting him.  Id. (explaining that he intended "[t]o stop the threat that was coming at me [and to] . . . stop the person in charge of the weapon that was being used against me").  He fled towards the northern exit of the Jiffy Mart to avoid the car.  Id. at 63-65.  Officer Barrows fired additional shots while doing so.  Id. at 64-65.  An approximately twelve-foot high snowbank prevented him from retreating backwards.  Id. at 63.

Once he begins firing his gun at the car, Officer Barrows' account of the shooting is no longer at odds with the Plaintiff's account.[3]  Following the first shot, the Plaintiff leaned to the left for cover as Officer Barrows fired six additional shots.  (Doc. 94-2 at ¶¶ 43-44.)  Five of the seven shots fired struck the Plaintiff's car, with one bullet hitting its windshield, another hitting a post to the right of the driver's side window, a third hitting its T post, and two hitting the rear window.  Id. at ¶ 44.  Before the car exited the Jiffy Mart, a bullet struck the Plaintiff in the back.  Id. at ¶¶ 49, 58.  Officer Barrows fired all seven shots in about three seconds.  Id. at ¶ 54.  He testified that he knew exactly where each shot would go.  Id. at ¶ 48.  As it exited the Jiffy Mart, the Plaintiff's car hit Officer Barrows in the left arm and thumb.  (Doc. 89-2 at 50.)  Because he was bent over in his seat, the Plaintiff did not observe the collision.  Id.

The Plaintiff exited the Jiffy Mart and drove north on Route 7.  (Doc. 94-2 at ¶ 58.)  Officer Barrows then radioed dispatch that he had fired shots, surveyed the Jiffy Mart to ensure no bystanders were harmed, and proceeded to pursue the Plaintiff in his cruiser.  (Doc. 89-2 at ¶ 53.)  The Plaintiff drove a short distance, became unconscious, crossed the centerline, and struck a vehicle before stopping in the parking lot of a liquor store.  Id. at ¶ 55; Doc. 94-2 at ¶ 59.  Officer

_____

[3]  A customer at the Jiffy Mart, Melissa Clark, provided a third account, which largely corroborates Officer Barrows' account.  (Doc. 89-6.)  Ms. Clark witnessed the Plaintiff back his car up "pretty fast and erratically," slam it into the protective barrier before the gas pumps, and hit Officer Barrows as he exited the parking lot.  Id. at 6-7.  Ms. Clark heard Officer Barrows yelling "stop the car" before firing the shots.  Id. at 6.

Barrows spotted the Plaintiff's car and pulled into the parking lot. (Doc. 94-2 at ¶ 61.) He exited his cruiser, drew his gun, and ordered the Plaintiff to get on the ground. Id. at ¶ 62. The Plaintiff was then placed in handcuffs and transported to the hospital. Id. at ¶ 63. A subsequent blood test determined that he had operated his vehicle with a .240 blood alcohol content. (Doc. 89-2 at ¶ 59.)

Several more SPD officers converged on the scene, including the Chief of Police, James Warden. (Doc. 94-2 at ¶ 64-65.) As soon as he arrived, Chief Warden requested that dispatch contact the Vermont State Police ("VSP") to commence an investigation of the shooting. (Doc. 89-2 at ¶ 62.) The VSP took control of the scene and conducted the entire investigation. (Doc. 94-2 at ¶ 67.) The Vermont Attorney General's Office reviewed the results of the investigation and concluded that Office Barrows acted reasonably and with legal justification in using deadly force. Id. at ¶ 69. The Plaintiff's expert disputes this determination, concluding instead that the use of deadly force was "inappropriate and unnecessary and did not comport with standard police practices and procedures." Id. at ¶ 55.

Following the shooting and arrest, Officer Barrows drove to the emergency room at Fletcher Allen Health Care in Burlington, where he was examined for injuries to his hand, arm, and leg. (Doc. 94-15 at 1, 4; Doc. 94-18 at 6.) Officer Barrows informed a nurse that he takes Wellbutrin daily and had taken it earlier that day. (Doc. 94-15 at 6.) The SPD has not implemented a policy that requires its officers to report changes in their mental health conditions. See Doc. 96-1 at 3.

The Plaintiff ultimately pleaded no contest to reckless endangerment and guilty to grossly negligent operation, driving with a suspended license, and driving while intoxicated, third offense. (Doc. 94-2 at ¶ 70.) He was sentenced to serve six to sixteen years for these offenses. Id.

At the time of the shooting, Chief Warden had served as the Town's police chief for over two decades. (Doc. 89-2 at ¶ 68.) The shooting at the Jiffy Mart was the first incident during his

tenure in which an officer used deadly force.  Id.  The SPD handled nearly a hundred thousand calls

for service from 2001 to 2012.  Id.  It faces only one other lawsuit alleging excessive force from that

time period.  Id.  Officer Barrows is not involved in that lawsuit.  Id.

The SPD has a policy on the use of force, which includes a section on shooting at moving

vehicles.  Id. at ¶¶ 77-78.  That section provides:

> Officers will not discharge a firearm at or from a moving vehicle,
> except when all other reasonable means have been exhausted and it is
> necessary for the defense of the officer's life or the life of another
> person, or the officer reasonably believes that the suspect poses a
> significant threat of death or serious harm to the officer or others.

Id. at ¶ 78.  SPD officers review the use of force policy when hired and, at least annually, during a

departmental training.  Id. at ¶ 74.  At basic training at the Vermont Police Academy, as well as in-

service firearms training at the SPD, officers also receive training on the use of force.  Id. at ¶¶ 70,

74, 76.  The in-service trainings occur semi-annually and apply the use of force policy during

scenario-based drills.  Id. at ¶¶ 73, 76.

III.    Discussion

    A.    Standard of Review

Federal Rule of Civil Procedure 56(a) requires a court to "grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact."  Scott v. Harris, 550

U.S. 372, 380 (2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).  A fact

is "material" if it "might affect the outcome of the suit under the governing law."  Anderson, 477

U.S. at 248.  A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Id.  In determining whether there is a "genuine dispute as to any material fact," a court "must draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment." Coollick v. Hughes, 699 F.3d 211, 219 (2d Cir. 2012) (internal quotations omitted).

The moving party bears the initial burden of showing that summary judgment is warranted. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A moving party may discharge this burden "by 'showing'–that is pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  To defeat summary judgment, the nonmoving party must then "come forward with evidence that would be sufficient to support a jury verdict in its favor." Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002) (internal quotations omitted).  The nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Id. (internal quotations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott, 550 U.S. at 380 (internal quotations omitted).

### B.  Officer Barrows

The Plaintiff alleges in his complaint that Officer Barrows violated the Fourth and Fourteenth Amendment through his excessive use of force.  (Doc. 6 at 4.)  A plaintiff may only assert an excessive force claim under the Fourteenth Amendment if the Fourth Amendment is inapplicable. Graham v. Connor, 490 U.S. 386, 395 (1989).  "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under [the Fourteenth Amendment's] 'substantive due

process' approach." Id. Officer Barrows contends the excessive force claim stems from his seizure of the Plaintiff, making the Fourth Amendment applicable here. (Doc. 91-1 at 15.) The Plaintiff only addresses this standard in his summary judgment opposition. See Doc. 94-1 at 8-10. Because his opposition does not also address the Fourteenth Amendment, the Court deems it abandoned. See, e.g., Pibouin v. CA, Inc., 867 F. Supp. 2d 315, 325-26 (E.D.N.Y. 2012) (plaintiff abandoned retaliation claim defendants addressed in summary judgment motion, yet plaintiff failed to address in opposition) (citing cases). The Court will therefore analyze the Plaintiff's excessive force claim under the Fourth Amendment.

Officer Barrows contends he is entitled to qualified immunity. (Doc. 91-1 at 8.) The defense of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The defense "applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Id. (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004)). To decide a motion for summary judgment based on a qualified immunity defense, a court must consider two questions: "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation."[4] Tracy v. Freshwater, 623 F.3d 90, 96 (2010). The Supreme

---

[4] In some cases, the Second Circuit has formulated the qualified immunity standard as a three-prong test. These cases bifurcate the "clearly established" prong into two prongs, asking whether: (1) a constitutional or statutory right was clearly established, and (2) the defendant acted reasonably given the clearly established law at the time. Taravella v. Town of Wolcott, 599 F.3d 129, 136-41 (2d Cir. 2010) (Straub, dissenting) (criticizing this three-prong formulation). Because these two inquiries are closely intertwined, the Court addresses them together here.

Court no longer mandates that this two-prong inquiry proceed sequentially. Pearson, 555 U.S. at 236, modifying, Saucier v. Katz, 533 U.S. 194 (2001). A court may instead exercise "its sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. Answering either prong in the negative will bar suit against the official. Id. at 232.

The Court elects to address the "clearly established" prong first. "If the conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity." Doninger v. Niehoff, 642 F.3d 334, 345 (2d Cir. 2011) (internal quotations omitted). To determine whether a right was clearly established, a court examines whether "(1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." Id. A court undertakes this examination "in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." Id. at 202. The qualified immunity analysis is thus "particularized in the sense that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Doninger, 642 F.3d at 345-46. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." Id. at 346 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Rather, "in the light of pre-existing law[,] the unlawfulness must be apparent." Id. (quoting Creighton, 483 U.S. at 640). "Because the focus is on whether the officer had fair notice that her conduct was unlawful,

reasonableness is judged against the backdrop of the law at the time of the conduct." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam).

The Supreme Court has clearly established, as a general proposition, a Fourth Amendment right to be free from the use of force that is excessive under objective standards of reasonableness. Id. at 198-99. A court applying this standard must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Scott, 550 U.S. at 383 (internal quotations omitted). The reasonableness standard is "[in]capable of precise definition or mechanical application" and "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. For deadly force specifically, an officer's use of force is objectively reasonable only if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 36 (2d Cir. 2003). See also Brosseau, 543 U.S. at 197-98.

A court engages in a limited factual inquiry when applying the reasonableness standard on summary judgment. The relevant question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. A court must also limit its analysis to the "circumstances immediately prior to and at the moment [the officers] made the split-second decision to employ deadly force." Salim v. Proulx, 93 F.3d 86, 92 (2d Cir.1996). Furthermore, a court reviewing a summary judgment motion must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. Scott, 550 U.S. at 378. For the purposes of this

motion, this Court will therefore adopt the Plaintiff's version of the facts, supplemented by the undisputed facts in the record.  Id. (explaining that a court usually adopts "the plaintiff's version of the facts" in qualified immunity cases).

Filtering the summary judgment record through the objective reasonableness and summary judgment standards, Officer Barrows nevertheless had reason to believe that the Plaintiff posed an immediate threat to himself and others.  When he began shooting at the Plaintiff, Officer Barrows was confronted with a driver who: (1) was the subject of an erratic driving report; (2) had responded to the presence of a marked cruiser in front of his car, with a uniformed officer exiting it, by backing away; (3) had proceeded to drive his car about five feet from the officer, who was now on foot and displaying his gun; (4) had "slammed on the gas and t[aken] off" when the officer pointed his gun at him; and (5) was exiting a congested gas station and headed towards a busy road.  Significantly, there is no dispute Officer Barrows fired his first shot after the Plaintiff slammed on the gas.  See Doc. 94-4 at 121-22 (Plaintiff testified that he "slammed on the gas because [Officer Barrows] started pointing a gun at [him]"); Doc. 89-5 at 61 (Officer Barrows testified that he fired once "the RPMs come up and [the Plaintiff's car] is now starting to speed at me").  Nor is there any dispute the Plaintiff was in close proximity to Officer Barrows when he did so.  To the extent various accounts of the incident conflict, however, the Court has adopted the Plaintiff's version.  The Court has disregarded undisputed facts that Officer Barrows only discovered following the shooting, such as the Plaintiff's high level of intoxication and his criminal record.  See Salim, 93 F.3d at 92 (directing courts to examine the "objective reasonableness of [an officer's] conduct at the moment he decided to employ deadly force").

Viewed against the relevant case law, it is not apparent Officer Barrows should have reasonably understood that his use of deadly force violated the Fourth Amendment.  The Second

Circuit addressed the use of force against fleeing suspects in <u>Cowan ex rel. Estate of Cooper v. Breen</u>, 352 F.3d 756 (2d Cir. 2003).[5] The police officer there fired two shots at a fleeing motorist, killing her with the second shot. <u>Id.</u> at 758. The officer claimed the motorist had attempted to run him down. <u>Id.</u> In opposing summary judgment, however, the motorist's estate presented evidence that she was traveling slowly; the officer was not in her path when he fired the second shot; he never attempted to flag her down before firing; and her car made no sudden turns traveling down the road. <u>Id.</u> at 763. At his deposition, the officer had also revealed that he fired the second, fatal shot because he was trained always to fire twice, not out of fear for his life. <u>Id.</u> Relying on the estate's version of the facts only, the Second Circuit concluded that "no reasonable officer . . . would have believed that at the crucial moment use of deadly force was necessary."[6] <u>Id.</u>

     <u>Cowan</u> does not squarely govern the shooting in this case. The Plaintiff's version of the facts here provides Officer Barrows with reason to believe that his erratic driving posed a significant threat. The Plaintiff did not testify that he drove slowly throughout the incident, instead conceding that he squealed his tires. The Plaintiff also acknowledged backing away from a marked police cruiser as an officer exited it. The 911 caller's erratic driving report and the rush hour traffic on Route 7, where the car was headed, also distinguish <u>Cowan</u> from this case. Furthermore, regardless

---

    [5] None of the parties' briefs addressed <u>Cowan</u>, which the Court found useful. The Court urges the parties to research Second Circuit case law more thoroughly in the future.

    [6] <u>Cowan</u> also noted that, even if the officer was in grave danger, the estate's expert raised questions about whether the officer acted reasonably in firing at the car. <u>Id.</u> Instead of firing at oncoming vehicles, the expert stated that police officers should get out of the way. <u>Id.</u> The Plaintiff in this case has submitted an expert report that likewise contends Officer Barrows should have let him escape, rather than shoot at his car. (Doc. 94-14 at 5-7.) The report only addresses whether the Plaintiff acted objectively reasonably, without any substantive discussion of the relevant case law. <u>But see id.</u> at 6 (quoting reasonableness standard for excessive use of force found in <u>Graham v. Connor</u>). The report provides little insight into the dispositive inquiry here: whether the law at the time made the unlawfulness of Officer Barrows' use of deadly force clear to a reasonable officer. <u>Saucier</u>, 533 U.S. at 202.

of whether Officer Barrows stood to the side of the Plaintiff's car or directly in front of it, the Plaintiff acknowledges accelerating rapidly forward within five feet of the officer. Officer Barrows may well have reasonably feared for his life, given his close proximity to the car. The plaintiff's evidence in Cowan, in contrast, suggested the officer fired his first shot from forty-four feet away and his second from eleven feet away. Id. at 759. Cowan stands for the proposition that an officer should not shoot at a fleeing motorist who poses no apparent threat to the officer or others. See id. at 763. Flight, without more, is insufficient to support the use of deadly force. See id. Yet Officer Barrows had reason to believe the Plaintiff posed a threat to other drivers, as well as himself. Cowan does not make the unlawfulness of his conduct apparent.

A more recent Supreme Court decision, Scott v. Harris, makes the unlawfulness of Officer Barrows' conduct even less apparent. A police officer in Scott terminated a high-speed car chase by ramming his cruiser into the bummer of the fleeing motorist's car. Scott, 550 U.S. at 375 The contact caused the car to swerve off the roadway, roll down an embankment, and crash, severely injuring the motorist in the process. Id. A videotape of the chase demonstrated that the motorist posed an "actual and imminent threat" to pedestrians, other motorists, and officers. Id. at 384. In concluding that the officer had acted reasonably, the Court employed a balancing test. Id. The Court specifically "weigh[ed] the perhaps lesser probability of [the motorist] injuring or killing numerous bystanders against the perhaps larger probability of [the officer] injuring or killing a single person." Id. In addition to considering the number of lives at stake, the Court also compared the "relative culpability" of the fleeing motorist and the innocent bystanders. Taking these considerations into account, the Court held that "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." Id.

at 386.  The Court also refused to mandate that officers cease pursuit when fleeing motorists "drive so recklessly that they put other people's live in danger."  Id. at 385.

The facts in Scott differ from those here.  Scott addressed the use of deadly force during a high-speed car chase, while Officer Barrows used deadly force in response to reckless driving in a parking lot.  Id. at 375.  The officer in Scott also rammed the fleeing motorist with his cruiser.  Id. Officer Barrows shot at the Plaintiff in this case.  But Scott also makes it clear that an officer may apply deadly force to prevent a reckless driver from harming innocent bystanders and motorists.  To decide whether an officer acts reasonably in doing so, Scott directs the courts to consider the relative culpability of the parties.  Id. at 384.  Just as in Scott, the reckless driving of the Plaintiff here "produced the choice between two evils that [Officer Barrows] confronted."  Id.  The facts vary sufficiently enough that Scott is not controlling, yet not so much that Officer Barrows' conduct is clearly unlawful.  Taken together, Scott and Cowan place the use of deadly force by Officer Barrows somewhere in that "hazy border between excessive and acceptable force."  Saucier, 533 U.S. at 206 (internal quotations omitted).  These cases do not establish that Officer Barrows should have reasonably understood he acted unlawfully in shooting at the Plaintiff.  "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."  Coollick, 699 F.3d at 220 (also explaining that "existing precedent must have placed the statutory or constitutional question beyond debate") (internal quotations omitted).  Officer Barrows is entitled to qualified immunity. His motion for summary judgment, as to the claim against him individually, is GRANTED.

The Plaintiff has also sued Officer Barrows in his official capacity.  (Doc. 6 at 2.)  A defendant may only raise qualified immunity "with respect to claims asserted against [him] in his individual capacity," making the defense inapplicable to this claim.  Frank v. Relin, 1 F.3d 1317, 1327 (2d Cir. 1993).  However, "official-capacity suits generally represent only another way of

pleading an action against an entity of which an officer is an agent." <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 n.55 (1978). "A suit against a municipal officer in his official capacity is functionally equivalent to a suit against the entity of which the officer is an agent." <u>Orange v. County of Suffolk</u>, 830 F. Supp. 701, 706 (E.D.N.Y. 1993). The official capacity claim against Officer Barrows is thus duplicative of the claim against the Town. It is therefore DISMISSED.

    C.    <u>Town of Shelburne</u>

    The Plaintiff asserts a section 1983 claim against the Town of Shelburne. (Doc. 6 at 6.) To hold a municipal defendant liable under section 1983, a plaintiff cannot rely on a respondeat superior theory of liability. <u>Jones v. Town of East Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012). Since <u>Monell v. Department of Social Services</u>, however, a plaintiff may hold a municipal defendant liable "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." <u>Id.</u> The Plaintiff contends that: (1) the Town inadequately trained its police officers on the use of force, and (2) no policy required Officer Barrows to report his use of Wellbutrin, an anti-depressant, or changes in his mental health condition.[7] (Doc. 94-1 at 13-14.)

    Even viewing the summary judgment record in the light most favorable to him, the Plaintiff has not supported his failure-to-train claim with sufficient facts. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." <u>Connick v. Thompson</u>, 131 S. Ct. 1350, 1359 (2011). For a claim to succeed, "a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with

───────────────

    [7] The Plaintiff also alleges in his complaint that the Town improperly hired Officer Barrows. The Town addressed this allegation in moving for summary judgment. (Doc. 89-1 at 13-17.) In opposition, however, the Plaintiff only advances the two liability theories listed above. The Court therefore deems his failure-to-train claim abandoned. <u>See, e.g.</u>, <u>Pibouin</u>, 867 F. Supp. 2d at 325-26.

whom the [untrained employees] come into contact." Id. (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). This standard of fault is stringent, requiring "proof that a municipal actor disregarded a known or obvious consequence of his action." Id. at 1360 (internal quotations omitted). Deliberate indifference typically requires that municipal policymakers retain a training program despite "actual or constructive notice that a particular omission in [it]" causes constitutional violations. Id. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id. (quoting Bd. of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 409 (1997)). Absent notice a training program is deficient in a particular respect, a municipal policymaker "can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id.

The Plaintiff has not presented any evidence of a pattern of deadly force by SPD officers so pervasive as to place the Town on actual or constructive notice of an inadequacy in the SPD's training program. Rather, it is undisputed that no SPD officer has used deadly force in the past twenty-five years. Despite handling nearly a hundred thousand calls for service from 2001 to 2012, the SPD faces only one other lawsuit alleging excessive force during that time period. The summary judgment record falls far short of establishing a pattern of similar violations. Jones, 691 F.3d at 81 (explaining that "isolated acts of excessive force by non-policymaking municipal employees are generally not sufficient"). To hold the Town liable for inadequate training, without any notice of a deficiency in its police department's training regime, risks converting Monell liability into respondeat superior liability. Connick, 131 S. Ct. at 1359. The Supreme Court has repeatedly made clear that section 1983 does not impose vicarious liability on a municipality for the actions of its employees. Id. (citing cases).

In limited circumstances, however, "a patten of similar violations might not be necessary to show deliberate indifference." Id. at 1361. The Supreme Court has refused "to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under [section 1983] without proof of a pre-exiting pattern of violations." Id. As an example, the Court theorized in City of Canton v. Harris that failing to provide an armed police officer with any training about the constitutional limitations on the use of deadly force could constitute deliberate indifference. Harris, 489 U.S. at 390 n.10. The undisputed facts here establish no "patently obvious" failure to train. SPD officers must review the use of force policy when hired and at an annual in-service training. Through basic training at the Vermont Police Academy, as well as in-service firearms training on a semi-annual basis, all SPD officers also receive training on the constitutional limits of deadly force. The Plaintiff attempts to create a material dispute by alleging the officers merely read the policy at the in-service trainings, but do not receive classroom training or testing on it. In determining whether the Plaintiff has shown facts that arise to a patently obvious failure to train, this Court is unwilling to comb the SPD's training program with such a fine brush. The Supreme Court has specifically cautioned against engaging "in an endless exercise of second-guessing municipal employee-training programs." Id. at 392.

The Plaintiff also contends the Town should have implemented a policy that required Officer Barrows to report changes in his mental health condition, including his use of Wellbutrin. (Doc. 94-1 at 13-14.) In support of this theory of liability, the Plaintiff relies on a single piece of evidence: a medical record showing that Officer Barrows took Wellbutrin that day. (Doc. 94-15 at 6.) He has not made a sufficient showing of municipal liability under Monell to survive summary judgment. "[M]unicipal liability under [section 1983] attaches where–and only where–a deliberate

choice to follow a course of action is made from among various alternatives by city policymakers." Harris, 489 U.S. at 380 (internal quotations omitted). To hold a municipality liable for inaction, including the absence of an official policy, the courts have required that municipal officials act in deliberate indifference to an obvious risk. See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584-85 (3rd Cir. 2003). The Plaintiff has not pointed to a single past incident in which an SPD officer failed to report a mental health condition. Nor is it obvious that officers will not report such conditions absent an explicit policy. Moreover, assuming he established deliberate indifference, the Plaintiff has not shown that Officer Barrows' use of Wellbutrin caused him to discharge his firearm. Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985) (requiring "a causal connection–an affirmative link–between the policy [or custom] and the deprivation of his constitutional rights") (internal quotations omitted). Except for his unsupported assertion that Wellburtin is an antidepressant, there is no evidence in the summary judgment record that it could cause violent or irrational conduct.

The summary judgment record does not support either of the Plaintiff's theories of liability against the Town under Monell. Summary judgment is GRANTED in its favor.

D.     Chief Warden and Manager Bohne

The Plaintiff has sued Chief Warden and Manager Bohne in their official and individual capacities. (Doc. 6 at 2.) Just as with Officer Barrows, however, the Plaintiff's official capacity claims against Chief Warden and Manager Bohne are duplicative of his claim against the Town. These claims are therefore DISMISSED.

With the official capacity claims dismissed, only the individual claims against Chief Warden and Manager Bohne remain. "To establish the liability of a supervisory official under [section 1983], a plaintiff must show the defendant's personal involvement in the alleged constitutional violations."

19

Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam).  A plaintiff may show personal involvement through: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring."  Id.  The Plaintiff here attempts to hold Chief Warden and Manager Bohne liable based on their failure to train Officer Barrows adequately and their failure to implement a mental health reporting policy.  (Doc. 94-1 at 13-14.)  For the same reasons he has not shown a failure-to-train claim against the Town, the Plaintiff has not supported his failure-to-train claim against Chief Warden and Manager Bohne sufficiently.

The Plaintiff also asserts, in passing, that Chief Warden and Manager Bohne's supervision of Officer Barrows was grossly negligent because they had no knowledge he used Wellbutrin.  Id. at 14.  A supervisor may be liable under section 1983 "for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and her injury."  Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002).  As discussed above, the Plaintiff has failed to link Officer Barrows' use of Wellbutrin to the shooting at the Jiffy Mart.  Accordingly, putting aside whether a lack of awareness could even constitute gross negligence, the Plaintiff's theory of liability lacks factual support.  See id. at 140 n.14 (describing gross negligence as the "kind of conduct . . . where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk") (internal quotations omitted).

Summary judgment is GRANTED in favor of Chief Warden and Manager Bohne on the Plaintiff's individual capacity claims against them.

IV.     Conclusion

For the foregoing reasons, the Defendants' motions for summary judgment (Docs. 89, 91) are GRANTED.  This action is DISMISSED in its entirety.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 7th day of February, 2013.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
United States District Judge